# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
# 24-20155-CR-BECERRA/TORRES

Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 1956(h)
18 U.S.C. § 2
18 U.S.C. § 982(a)(1), (a)(7)

FILED BY _____ **MP** _____ D.C.

**Apr 16, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES OF AMERICA

**vs.**

## ENRIQUE PEREZ-PARIS,
## DIEGO SANUDO SANCHEZ CHOCRON, and
## GREGORY CHARLES MILO CASKEY,

Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

## COVID-19 Outbreak and Testing

1.  In or around December 2019, severe acute respiratory syndrome coronavirus 2

(SARS-CoV-2), the virus that causes coronavirus disease ("COVID-19"), began to spread

throughout the world.

2.  On January 31, 2020, the Secretary of the U.S. Department of Health and Human

Services ("HHS") declared that, in light of the confirmed cases of COVID-19, a public health

emergency existed nationwide.

3.     In Proclamation 9994 of March 13, 2020, the United States President declared the ongoing COVID-19 pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia.

4.     Individuals sought COVID-19 testing for a variety of reasons, including for diagnosis when suffering from COVID-19 symptoms, and in advance of engaging in certain activities, like airplane travel and planned contact with others who, due to age or health conditions, were at higher risk of death or severe illness from COVID-19.  Individuals often needed their test results within a short period of time before engaging in such activities.

5.     On or around April 10, 2023, the United States President signed a joint resolution from the U.S. Congress to terminate the national emergency declared in Proclamation 9994 of March 13, 2020.

### United States Food & Drug Administration ("FDA") Emergency-Use Authorization

6.     Emergency Use Authorization ("EUA") authority allowed the FDA to help strengthen the nation's public health protections against chemical, biological, radiological, and nuclear ("CBRN") threats including infectious diseases, by facilitating the availability and use of medical countermeasures needed during public health emergencies.

7.     Under Section 564 of the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), Title 21, United States Code, Section 360bbb–3, when the Secretary of HHS declared that an emergency use authorization is appropriate, the FDA was permitted to authorize unapproved medical products or unapproved uses of approved medical products to be used in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by CBRN threat agents when certain criteria were met, including when there were no adequate, approved, and available alternatives.

8.      On February 4, 2020, the Secretary of HHS determined that there was a public health emergency that had a significant potential to affect national security or the health and security of United States citizens living abroad and that involved COVID-19.  Based on that determination, the Secretary of HHS also declared that circumstances existed justifying the authorization of emergency use of *in vitro* diagnostics for detection and/or diagnosis of COVID-19, subject to the terms of any authorization issued pursuant to the FD&C Act.

9.      Throughout the pandemic, various *in vitro* tests to detect COVID-19 were developed.  This included COVID-19 polymerase chain reaction ("PCR") tests and COVID-19 antigen tests (collectively, "COVID-19 testing").  COVID-19 PCR tests were a type of nucleic acid amplification test, which were more likely to detect the virus than antigen tests.  COVID-19 PCR samples were usually taken by a health care provider and transported to a laboratory for testing.  It could take up to 3 days to receive COVID-19 PCR results.  COVID-19 antigen tests were rapid tests that usually produced results in 15-30 minutes.

## Medicare Program

10.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations. HHS, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.   Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

11.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

12.      Medicare covered different types of benefits and was separated into different

3

program "parts."  Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

13.     Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

14.     A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").  The claim form could be submitted in hard copy or electronically via interstate wire.  When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the items and services that were purportedly provided, as set forth in the claims, were medically necessary.

15.     Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.  Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

## Medicare Part B Enrollment

16.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

17.     Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Arkansas, Colorado, New Mexico, Oklahoma, Texas, Louisiana, and Mississippi.

18.     To receive Medicare reimbursement, providers had to make appropriate applications to the MAC and execute a written provider agreement.  The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

19.     CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare

5

and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

20.      Payments under Medicare Part B were often made directly to the health care provider rather than to the beneficiary.  For this to occur, the beneficiary would assign the right of payment to the health care provider.  Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Medicare Part B Coverage for Diagnostic Laboratory Tests

21.      Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."  Medicare did not cover COVID-19 tests that were not FDA-authorized.

22.      If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing.  "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."  42 U.S.C. § 410.32(a).  "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  *Id.*

23.      Additionally, "[d]uring the Public Health Emergency for COVID–19, . . . the order of a physician or other applicable practitioner is not required for one otherwise covered diagnostic laboratory test for COVID–19 . . . .  Subsequent otherwise covered COVID–19 and related tests

6

described in the previous sentence are reasonable and necessary when ordered by a physician or nonphysician practitioner in accordance with this paragraph (a) . . . ." 42 U.S.C. § 410.32(a)(3).

## The HRSA Uninsured Program

24.     The Families First Coronavirus Response Act ("FFCRA") was a federal law enacted on or about March 14, 2020, as part of the federal government's initial response to the then-emerging COVID-19 pandemic.

25.     The FFCRA, among other things, appropriated funds to reimburse the cost of providing diagnostic testing and services for COVID-19 in individuals without health insurance. These funds, and additional funds appropriated through subsequent legislation for testing, treatment, and vaccines for uninsured individuals, were distributed through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program ("HRSA COVID-19 Uninsured Program").

26.     The HRSA COVID-19 Uninsured Program was administered by HHS through its agency, the Health Resources and Services Administration ("HRSA"). HRSA contracted with UnitedHealth Group, a private insurance company, to handle claims administration and payments, which UnitedHealth Group performed through its unit Optum Health. Reimbursements by HRSA were provided on a rolling basis directly to eligible providers, including laboratories. The HRSA COVID-19 Uninsured Program was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b), in that it was a public plan or contract affecting commerce.

27.     To receive reimbursement under the HRSA COVID-19 Uninsured Program, a provider was required to attest to compliance with the Terms and Conditions of the program. The terms and conditions required the provider to submit truthful claims, with respect to uninsured individuals, for: (1) COVID-19 testing, which was defined as a test for the detection of SARS-

CoV-2 or the diagnosis of the virus that causes COVID-19, and/or testing-related items and services such as an office visit or a telehealth visit that resulted in the administration of a COVID-19 test; (2) care or treatment related to positive diagnoses of COVID-19, where COVID-19 was the primary reason for treatment; or (3) administering a COVID-19 vaccination. Services not covered by traditional Medicare were also not covered under the HRSA COVID-19 Uninsured Program.

28.     Providers seeking reimbursement under the HRSA COVID-19 Uninsured Program were required to enroll as a provider participant, check to ensure that patients were uninsured, submit claims and patient information electronically, and receive payment through direct deposit. Reimbursements were generally made at Medicare rates.

29.     Claims submitted electronically to the HRSA COVID-19 Uninsured Program and payments made from the HRSA COVID-19 Uninsured Program were transmitted through interstate wires.

### The Defendants, Related Entities and Relevant Persons

30.     Innovative Genomics LLC ("IGX"), a limited liability company formed under the laws of Texas, was a laboratory that purportedly provided COVID-19 PCR and other forms of laboratory testing.

31.     Defendant **ENRIQUE PEREZ-PARIS**, a resident of Miami-Dade County, Florida, was an owner, manager, and operator of IGX.

32.     Defendant **DIEGO SANUDO SANCHEZ CHOCRON**, a resident of Los Angeles County, California, was an owner, manager, and operator of IGX.

33.     Defendant **GREGORY CHARLES MILO CASKEY**, a resident of Bexar County, Texas, was an owner, manager, and operator of IGX.

34.     Nikita Hermesman, a current resident of Bexar County, Texas, and former resident of Miami-Dade County, Florida, was an owner, manager, and operator of IGX.

35.     Company 1 was a company incorporated under the laws of Florida, with its principal place of business in Miami-Dade County, Florida.

36.     Co-Conspirator 1, a resident of Miami-Dade County, Florida, was an owner, manager, and operator of Company 1.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around November 2019, and continuing through in or around June 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,
DIEGO SANUDO SANCHEZ CHOCRON, and
GREGORY CHARLES MILO CASKEY,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, Nikita Hermesman, Co-Conspirator 1, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including Medicare and the HRSA COVID-19 Uninsured Program, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection

with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of PCR testing by IGX, from the Southern District of Florida, and elsewhere, so that IGX could bill health care benefit programs for COVID-19 testing, without regard to whether the beneficiaries needed the tests or whether the tests were eligible for reimbursement; (b) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to health care benefit programs for COVID-19 testing that were medically unnecessary and ineligible for reimbursement; (c) concealing the submission of false and fraudulent claims to health care benefit programs; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

10

**Manner and Means**

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.      **ENRIQUE PEREZ-PARIS** and **DIEGO SANUDO SANCHEZ CHOCRON** enrolled IGX as a provider with Medicare, the HRSA COVID-19 Uninsured Program, and other health care benefit programs to receive reimbursements for COVID-19 testing. In these enrollment documents, **ENRIQUE PEREZ-PARIS** and **DIEGO SANUDO SANCHEZ CHOCRON** listed themselves, **GREGORY CHARLES MILO CASKEY**, and Nikita Hermesman as IGX's owners.

5.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators agreed to pay kickbacks and bribes to patient recruiters, including Co-Conspirator 1, for ordering and arranging for the ordering of COVID-19 testing by IGX, from the Southern District of Florida, and elsewhere, that could be billed to Medicare and the HRSA COVID-19 Uninsured Program. For example, **DIEGO SANUDO SANCHEZ CHOCRON**, through IGX, executed a contract to pay approximately $15 for each COVID-19 antigen test and approximately $35 for each COVID-19 PCR test that Co-Conspirator 1 referred to IGX.

6.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, Co-Conspirator 1, and other co-conspirators recruited health care providers, including doctors, to order repeated COVID-19 PCR tests for beneficiaries, even though the health care providers had no prior relationship with the beneficiaries, were not treating the beneficiaries for COVID-19 or symptoms of COVID-19, sometimes were ineligible to order the tests altogether, and did not use the test results to treat the beneficiaries.

7.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators, through IGX, billed, and caused to be billed, to Medicare, the HRSA COVID-19 Uninsured Program, and other health care benefit programs, claims for reimbursement for COVID-19 testing but the tests, if performed at all, did not have FDA emergency-use authorization and were not reimbursable.

8.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators, through IGX, billed, and caused to be billed, to Medicare, the HRSA COVID-19 Uninsured Program, and other health care benefit programs, COVID-19 testing that was medically unnecessary, never provided, and ineligible for reimbursement.

9.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators, through IGX, billed, and caused to be billed, to the HRSA COVID-19 Uninsured Program, COVID-19 testing for Medicare beneficiaries despite the HRSA COVID-19 Uninsured Program being reserved for individuals who were uninsured.

10.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators caused IGX to submit false and fraudulent claims to Medicare and the HRSA COVID-19 Uninsured Program, via interstate wire communications, in at least the approximate amount of $36,442,556 for COVID-19 testing.

11.     As the result of these false and fraudulent claims, Medicare and the HRSA COVID-19 Uninsured Program made payments to IGX, via interstate wire transfers, in at least the approximate amount of $28,559,820.

12.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, Co-Conspirator 1, and other co-conspirators, used the proceeds of the fraud to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-4**
**Health Care Fraud**
**(18 U.S.C. § 1347)**

1.     Paragraphs 1-23 and 30-36 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around November 2019, and continuing through in or around June 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,**
**DIEGO SANUDO SANCHEZ CHOCRON, and**
**GREGORY CHARLES MILO CASKEY,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program.

### Purpose of the Scheme and Artifice

3.      The Purpose of the Conspiracy section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### The Scheme and Artifice

4.      The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution or Attempted Execution
### of the Scheme and Artifice

5.      On or about the dates set forth as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,**
**DIEGO SANUDO SANCHEZ CHOCRON, and**
**GREGORY CHARLES MILO CASKEY,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, in that the defendants submitted, and caused the submission of, false and fraudulent claims, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary, eligible for Medicare reimbursement, and provided to beneficiaries as claimed:

| Count | Beneficiary | Approx. Date of Submission | Medicare Claim No. | Description of Claims; Total Approx. Amount Billed |
|-------|-------------|----------------------------|---------------------|-----------------------------------------------------|
| 2 | E.P. | 04/28/2022 | 452922118223050 | Infectious Agent Detection by Nucleic Acid $112.50 |

| Count | Beneficiary | Approx. Date of Submission | Medicare Claim No. | Description of Claims; Total Approx. Amount Billed |
|-------|-------------|---------------------------|--------------------|--------------------------------------------------|
| 3 | E.P. | 05/05/2022 | 452922125166000 | Infectious Agent Detection by Nucleic Acid $112.50 |
| 4 | E.P. | 06/16/2022 | 452922167236150 | Infectious Agent Detection by Nucleic Acid $112.50 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 5
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around November 2019, and continuing through in or around June 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,
DIEGO SANUDO SANCHEZ CHOCRON, and
GREGORY CHARLES MILO CASKEY,**

did knowingly and voluntarily combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(h), that is, to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957(a).

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; and health care fraud, in violation of Title 18, United States Code, Section 1347.

15

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants, **ENRIQUE PEREZ-PARIS**, **DIEGO SANUDO SANCHEZ CHOCRON**, and **GREGORY CHARLES MILO CASKEY**, have an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Sections 1349 or 1347, as alleged in this Indictment, the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      Upon conviction of a violation of Title 18, United States Code, Section 1956(h), as alleged in this Indictment, the defendants shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

    d.   has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Sections 982(a)(1) and (a)(7), and the procedures set forth in Title 21, United States Code, Sections 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

GRAND JURY FOREPERSON

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

REGINALD CUYLER JR.
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

17

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.:** <u>24-20155-CR-BECERRA/TORRES</u>

v.

**CERTIFICATE OF TRIAL ATTORNEY**

ENRIQUE PEREZ-PARIS, et al.,

_____ _____/

Defendants.

**Superseding Case Information:**

New Defendant(s) (Yes or No) _____

Number of New Defendants _____

Total number of new counts _____

**Court Division** (select one)

☒ Miami      ☐ Key West      ☐ FTP

☐ FTL       ☐ WPB

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3.  Interpreter: (Yes or No) <u>No</u>
    List language and/or dialect: _____

4.  This case will take <u>10</u> days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                (Check only one)

    I    ☐ 0 to 5 days          ☐ Petty
    II   ☒ 6 to 10 days         ☐ Minor
    III  ☐ 11 to 20 days        ☐ Misdemeanor
    IV   ☐ 21 to 60 days        ☒ Felony
    V    ☐ 61 days and over

6.  Has this case been previously filed in this District Court? (Yes or No) <u>No</u>
    If yes, Judge _____ Case No. _____

7.  Has a complaint been filed in this matter? (Yes or No) <u>No</u>
    If yes, Magistrate Case No. _____

8.  Does this case relate to a previously filed matter in this District Court? (Yes or No) <u>Yes</u>
    If yes, Judge Altonaga                Case No. 24-20083-CR _____

9.  Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) <u>No</u>

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) <u>No</u>

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) <u>No</u>

15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? <u>No</u>

16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? <u>No</u>

By: _____

REGINALD CUYLER JR.

DOJ Trial Attorney

FL Bar No.      0114062

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** _____ **ENRIQUE PEREZ-PARIS** _____

**Case No:** _____

Count #:   1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud
* **Max. Term of Imprisonment:    20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 4

  Title 18, United States Code, Section 1347

  Health Care Fraud
* **Max. Term of Imprisonment:    10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Count #:   5

  Title 18, United States Code, Section 1956(h)

  Conspiracy to Commit Money Laundering
* **Max. Term of Imprisonment:    20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**   **DIEGO SANUDO SANCHEZ CHOCRON**

**Case No:**

Count #:   1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud and Wire Fraud
* **Max. Term of Imprisonment:     20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:     3 years**
* **Max. Fine:     $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 4

Title 18, United States Code, Section 1347

Health Care Fraud
* **Max. Term of Imprisonment:     10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):     N/A**
* **Max. Supervised Release:     3 years**
* **Max. Fine:     $250,000 or twice the gross gain or loss from the offense**

Count #:   5

Title 18, United States Code, Section 1956(h)

Conspiracy to Commit Money Laundering
* **Max. Term of Imprisonment:   20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):     N/A**
* **Max. Supervised Release:     3 years**
* **Max. Fine:     $500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**    **GREGORY CHARLES MILO CASKEY**

**Case No:** _____

Count #:   1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud
**\* Max. Term of Imprisonment:**   **20 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):**  **N/A**
**\* Max. Supervised Release:**   **3 years**
**\* Max. Fine:**   **$250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 4

  Title 18, United States Code, Section 1347

  Health Care Fraud
**\* Max. Term of Imprisonment:**   **10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):**   **N/A**
**\* Max. Supervised Release:**   **3 years**
**\* Max. Fine:**   **$250,000 or twice the gross gain or loss from the offense**

Count #:   5

  Title 18, United States Code, Section 1956(h)

  Conspiracy to Commit Money Laundering
**\* Max. Term of Imprisonment:**   **20 years**
**\* Mandatory Min. Term of Imprisonment (if applicable):**   **N/A**
**\* Max. Supervised Release:**   **3 years**
**\* Max. Fine:**   **$500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines. It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**